# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

CHRISHAWN LLOYD STUCKEY,

        Defendant.

Case No. 24-cr-2017-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## I.    INTRODUCTION

On April 23, 2024, the Grand Jury returned an Indictment, charging Defendant with one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8).  (Doc. 3.)  The matter before me is Defendant's motion to suppress.  (Doc. 16.)  The motion was filed October 8, 2024, and contained an inventory of items to be suppressed.  (*Id*.)  The Government timely filed a response on October 11, 2024.  (Doc. 23.)  Defendant filed a reply on October 17, 2024.  (Doc. 31.)  On October 29, 2024, Defendant filed a supplemental brief.  (Doc. 37.)  The Government timely filed a response to Defendant's supplemental brief on November 4, 2024.  (Doc. 38.)  The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on October 22, 2024.  (Doc. 34.)

The motion arises from a traffic stop that occurred on February 2, 2024, in Black Hawk County, Iowa.

1

Defendant moves to suppress any evidence obtained from the allegedly unlawful search of his vehicle on February 2, 2024. (Doc. 16.) Evidence he seeks to suppress includes his statements to authorities, a firearm, and any other evidence obtained as a result of the stop.

At the hearing, the Government's Exhibits 1-5 were admitted without objection:

1. Audio of First 911 Call;

2. Audio of Second 911 Call;

3. Bose Body Camera;

4. Savage Body Camera; and

5. Bose Interior Car Camera.

Defendant's Exhibits A-B were also admitted without objection:

A. Waterloo Police Department Incident Report; and

B. Waterloo Police Department Supplemental Report.

The Government called Waterloo Police Department Lieutenant Steven Bose.[1] Defendant called Waterloo Police Department Sergeant Edward Savage.[2] I found both officers to be credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

On February 2, 2024, around 3:00 p.m., Lt. Bose was on patrol and heard the law enforcement dispatcher ("dispatch") send two officers to a nearby Walmart store on a report of a disorderly and intoxicated male at the store causing problems. Lt. Bose

---

[1] Lt. Bose is a graduate of the Iowa Law Enforcement Academy and has been employed by the Waterloo Police Department since 2002. He has been a patrol officer for 22 years and was promoted to sergeant in 2014 and lieutenant in 2018.

[2] Sgt. Savage is a graduate of the Iowa Law Enforcement Academy and has been employed by the Waterloo Police Department for 18 years. In addition to patrol, Sgt. Savage has been assigned to the Violent Crimes Apprehension Team and the FBI Safe Streets Task Force.

continued his patrol and "started drifting" toward Walmart in case the officers who had been dispatched there needed any help. While heading toward the Walmart, dispatch advised that the intoxicated individual was observed leaving the Walmart building and was headed toward his vehicle, a dark Dodge Durango with Dan Deery license plates,[3] parked near the Walmart pharmacy.

When Lt. Bose neared Walmart, he observed the Durango exiting the parking lot. He observed the Durango turn erratically at a high rate of speed, hit the median curb, and head east. Lt. Bose accelerated and drove behind the Durango. While following the Durango, Lt. Bose observed it swerving within its lane and for a short distance straddle the center white-dotted line. Based on his observations, Lt. Bose called dispatch and requested a patrol officer who was working that afternoon and assigned to the Governor's Traffic Safety Bureau ("GTSB") to assist with a traffic stop.[4] Lt. Bose continued to follow the Durango to allow the GTSB officer time to arrive closer to the area.

Lt. Bose testified that he believed he was dealing with an OWI because the reporting party called law enforcement regarding an intoxicated male inside Walmart. Lt. Bose also testified regarding the Durango's rapid wide-right turn, hitting the center median curb, and the lane violation of crossing the center line. These observations suggested to Lt. Bose that the driver of the Durango may be intoxicated.[5]

---

[3] In his testimony, Lt. Bose indicated that he was aware of an investigation regarding a hit-and-run accident that had happened earlier in the day where the description of the offending vehicle matched the Durango. (Doc. 36 at 21.)

[4] According to Lt. Bose, GTSB officers often take care of traffic stops involving operating while intoxicated ("OWI").

[5] Lt. Bose testified that prior to initiating the traffic stop, he observed the Durango cross the center line a second time.

Eventually, a second squad car driven by Sgt. Savage arrived and fell in behind Lt. Bose. Sgt. Savage was coming from the opposite direction and had turned on his vehicle's emergency lights. Sgt. Savage performed a U-turn to follow Lt. Bose and the Durango. Sgt. Savage testified that he joined the pursuit to back up Lt. Bose, but he had not observed the driver's erratic driving behavior from when the Durango had left the Walmart parking lot. (Doc. 36 at 92.)

Lt. Bose turned on his emergency lights and siren to initiate a traffic stop.[6] The Durango did not immediately pull over and instead entered an on-ramp to travel onto Highway 218. The traffic on the on-ramp was congested and the Durango became stuck in traffic that was waiting at a traffic light. In hopes of preventing a high-speed pursuit in heavy highway traffic, Lt. Bose and Sgt. Savage initiated a "pinch block" maneuver to keep the Durango from entering Highway 218. Lt. Bose blocked the front of the Durango and Sgt. Savage blocked the rear of the Durango. The Durango reversed and collided with Sgt. Savage's patrol vehicle. While this was happening, Lt. Bose remained in his patrol car and observed the driver of the Durango shift his shoulders to the right and reach back towards the rear seat on the passenger's side. (*Id.* at 17.) Sgt. Savage, who was directly behind the Durango, testified that he could not view the driver through the rear window because the headrests from the second-row seats obstructed his view. (*Id.* at 94.)

Lt. Bose exited his patrol vehicle and made a quick approach to the front passenger side of the Durango. Sgt. Savage was at the driver's side of the Durango. Upon exiting his patrol car, Sgt. Savage drew his firearm and instructed the driver to put his hands out

[6] In his testimony, Lt. Bose testified that Sgt. Savage may have initially turned on his vehicle's emergency lights, because when he arrived on the scene, he was traveling in the opposite direction of himself and the Durango, which required Sgt. Savage to perform a U-turn to follow them. (Doc. 36 at 12.)

4

of the window and exit the Durango. Sgt. Savage testified that he drew his firearm because he did not know "what was going on," or why the driver backed into his patrol vehicle. Sgt. Savage also stated that he drew his firearm based on the nature of the call and the driver potentially being intoxicated, and concern for the possibility that the driver had a weapon. (*Id.* at 95.) Immediately, upon exiting his patrol vehicle, Lt. Bose heard Sgt. Savage yell "32."[7] Next, Lt. Bose heard Sgt. Savage order the driver out of the vehicle. The driver slowly exited the vehicle. Before the driver exited the Durango, Lt. Bose opened the passenger door in order to have a clear and unobstructed view of the driver and his hands. Lt. Bose was concerned for officer safety and the possibility that the driver had a weapon given the movements he observed and the driver being slow to come to a stop.[8]

As the driver was exiting the Durango, Lt. Bose walked from the passenger's side of the Durango to the front of the vehicle. Lt. Bose assisted Sgt. Savage with placing the driver into handcuffs. While taking the driver into custody, Lt. Bose explained to the driver the reasons for pulling him over, including drunk driving, swerving, and backing

---

[7] "32" is police code for somebody with a gun. Lt. Bose testified that he had two thoughts on Sgt. Savage yelling "32." Either Sgt. Savage had also seen the driver reaching to the rear passenger's seat, or Sgt. Savage was informing Lt. Bose that Sgt. Savage's firearm was displayed. (Doc. 36 at 18.) On cross-examination, Lt. Bose indicated that he had never heard another officer use "32" to indicate that an officer had drawn a firearm. Lt. Bose acknowledged that it was a possibility that an officer would use the term "32" for such purposes. (*Id.* at 61-62.) In his testimony, Sgt. Savage indicated that he had called out "32" to signal Lt. Bose that he had drawn his firearm. (*Id.* at 96.) Sgt. Savage acknowledged it was rare to use "32" to indicate a law enforcement officer had drawn a firearm. (*Id.* at 108-109.)

[8] Lt. Bose testified that when he opened the passenger door, he was not searching the car with his eyes looking for contraband, instead he was "just specifically looking at the defendant and looking at his hands." (Doc. 36 at 20-21.)

into a police car.[9]  (Gov. Ex. 3 at 3:45-3:52.)  Lt. Bose testified that he smelled the odor of alcohol coming from the driver.  (Doc. 36 at 23.)  Lt. Bose also noted that the driver's eyes were glassy, watery, and slightly bloodshot.  (*Id.*)  Sgt. Savage testified that he did not smell alcohol on the driver.  (*Id.* at 98.)  While Defendant was being taken into custody, Defendant was generally facing Lt. Bose and had his back to Sgt. Savage.  (Gov. Ex. 3 at 3:35-4:35.)  Sgt. Savage testified that he assumed Lt. Bose could smell alcohol on the driver and he could not because Lt. Bose was facing the driver's face.  (Doc. 36 at 103.)  Additionally, the driver identified himself to the officers as Chrishawn Stuckey. (Gov. Ex. 3 at 4:08-4:10.)

Once Defendant was in custody, Lt. Bose took Defendant to his patrol car.  Before placing Defendant in his patrol vehicle, Lt. Bose retrieved Defendant's driver's license and asked Defendant how much he had been drinking that day.  Lt. Bose also told Defendant that he had observed him swerving, hit a curb leaving the Walmart parking lot, and cross the center line multiple times.  Lt. Bose also informed Defendant that Walmart had called the police and reported that Defendant was intoxicated.  (*Id.* at 4:46-5:24.)

After Defendant was secured in the back of his patrol car, Lt. Bose searched Defendant's vehicle.  Specifically, Lt. Bose testified that his intent was to search "the immediate area that the defendant was observed reaching" and to search the vehicle for "open containers consistent with the odor of alcohol and the driving behaviors," he had observed.  (Doc. 36 at 25.)  Lt. Bose testified that he believed he had probable cause to search Defendant's vehicle based on the furtive movements to the area of the car that Defendant had been reaching.  (*Id.*)  Lt. Bose also told officers that he was looking in

---

[9] At the hearing, Sgt. Savage testified that Defendant was arrested for eluding, not stopping when he and Lt. Bose turned on their emergency lights, and for striking Sgt. Savage's patrol vehicle. (Doc. 36 at 98.)

the vehicle for open containers of alcohol because Defendant's breath smelled of alcohol. (Gov. Ex. 3 at 8:26-8:31.) In the back passenger seat, where he had observed Defendant reaching, Lt. Bose found a firearm underneath a couple of towels. (*Id.* at 5:57-6:05.)

Additionally, while Lt. Bose was taking Defendant to his patrol vehicle, Sgt. Savage opened the driver's door to the Durango and began looking for the vehicle's registration. (Doc. 36 at 100; Gov. Ex. 4 at 2:51-3:59.) Sgt. Savage testified that prior to Lt. Bose finding the firearm in the rear passenger seat, he did not have probable cause to search the vehicle. (Doc. 36 at 101.)

## III. DISCUSSION

### A. Parties' Arguments

Defendant argues that "the search of the vehicle violated the Fourth Amendment's protections against unreasonable searches and seizures." (Doc. 16-1 at 2.) Defendant maintains that law enforcement should have obtained his consent to search the vehicle or procured a search warrant before searching his car. (*Id.*) Defendant asserts that the likelihood of law enforcement finding evidence in the vehicle was low because "the police knew nothing about him other than he appeared to be under the influence and had been causing issues with customers at Walmart" and "rather than make the call themselves, the Constitution requires that the police should seek the approval of a judge to search the vehicle and its contents." (*Id.* at 3.) Defendant contends that Sgt. Savage's report offers no justification for the search and the video evidence offers no suggestion that the officers were in any danger "if they stood by while seeking a warrant." (*Id.*)

In his reply brief, Defendant argues that "law enforcement's search of [Defendant's] vehicle was not valid under the automobile exception to the warrant requirement." (Doc. 31 at 2.) Defendant asserts that there was "no evidence that law enforcement believed that alcohol had been consumed in the vehicle or evidence of such consumption would be present in the vehicle." (*Id.* at 3.) Defendant also argues that

7

"[t]her was no evidence that officers believed they would find any other contraband in the vehicle," as Defendant "made no admissions to being intoxicated, recently drinking alcohol, or having contraband in the vehicle." (*Id.*) Further, Defendant points out that officers "had clear views of the interior of the vehicle during when they interacted with [Defendant] to get him out of the vehicle" and there was "no evidence of drunk driving, open containers, or any other contraband." (*Id.* at 3-4.) Defendant also argues that "law enforcement's search of [Defendant's] vehicle was not a valid search incident to arrest." (*Id.* at 4.) Specifically, Defendant argues that "officers had no basis for believing evidence of drunk driving might be found in the vehicle." (*Id.*) Defendant maintains that "[t]here was nothing that Lt. Bose observed in the front row of the vehicle [that] could provide a 'reasonable basis' to conclude that evidence of drunk driving might be found in the vehicle." (*Id.* at 5.) (Cleaned up.)

In his supplemental brief, Defendant argues that "Sgt. Savage did not have probable cause, or reasonable suspicion to conduct a warrantless search of [Defendant's] vehicle after the Defendant was placed in handcuffs in the backseat of Lieutenant Bose's police vehicle." (Doc. 37 at 5.) Defendant maintains that "Sgt. Savage did not testify as to any belief that he would find evidence of a crime in the vehicle prior to initiating his search." (*Id.*) Defendant asserts that "[t]he search incident to arrest exception does not apply because the probable cause supporting the arrest of [Defendant], the eluding and striking Sgt. Savage's vehicle, would not reasonably lead an officer to conclude that the instrumentalities of those two crimes would be found inside [Defendant's] vehicle." (*Id.* at 6.) Defendant argues that Sgt. Savage "had not developed probable cause to enter the vehicle to search [for Defendant's] registration, because having a registered vehicle was not an element of the crime he based his search on, nor would it reasonably be tied to any instrumentality of eluding or striking Sgt. Savage[']s vehicle." (*Id.* at 8.) Defendant concludes that "[t]here is a strong presumption of the unconstitutionality of

8

warrantless searches, and here the officers at the scene went way beyond what was reasonably necessary to protect the officers, and to preserve any evidence or instrumentality of criminal activity." (*Id.* at 8-9.)

The Government argues that "law enforcement's search of defendant's vehicle was valid under the automobile exception to the warrant requirement." (Doc. 23-1 at 4.) Specifically, the Government argues that, based on the totality of the circumstances, Lieutenant Bose had probable cause to search the vehicle for evidence relating to defendant's intoxication and drunken collision with Sergeant Savage's car, such as open containers of alcohol. (*Id.* at 6.) The Government also argues that "law enforcement's search of defendant's vehicle was valid under the search incident to lawful arrest exception to the warrant requirement." (*Id.* at 7.) Specifically, the Government argues that "[t]here was a reasonable basis to believe that evidence related to the offense of arrest—operating a vehicle while intoxicated—might be found in the vehicle." (*Id.* at 9.)

In its response to Defendant's supplemental brief, the Government argues that Sgt. Savage "had probable cause to search defendant's car for evidence related to defendant's intoxication, eluding, and drunken collision into his car." (Doc. 38 at 4.) The Government maintains that "based on the collective knowledge of all investigating officers, there was probable cause to defendant's vehicle for evidence relating to defendant's intoxication, eluding, and drunken collision with Sergeant Savage's squad car." (*Id.* at 5.) Further, the Government asserts that Sgt. Savage's "search was not unreasonable—it was minor and unintrusive." (*Id.* at 6.) Relying on *New York v. Class*, 475 U.S. 106 (1986), the Government contends that "[j]ust as an officer may conduct a limited search [of] a car to look for a VIN, Sergeant Savage could search defendant's vehicle under these circumstances for the limited purpose of locating defendant's registration." (*Id.* at 7.) The Government concludes that:

There was a governmental interest in locating defendant's car registration, particularly because defendant had just drunkenly collided with Sergeant Savage's squad car. If defendant had remained in his car, Sergeant Savage would have been entitled to ask defendant to hand him the registration. Sergeant Savage minimally searched defendant's car by first looking in a customary spot where drivers store registration paperwork, the front center console and cupholder area. That is where he found defendant's registration. The search lasted approximately one minute. His search was focused and minimally invasive, and, under *New York v. Class*, it did not violate the Fourth Amendment.

(*Id.* at 8.)

## B.     Relevant Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)).

Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). However, courts have long recognized the "automobile exception" to the Fourth Amendment. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003); *see generally Carroll v. United States*, 267 U.S. 132, 158-59 (1925). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Kennedy*, 427 F.3d at 1140-41 (citations omitted); *see also United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) ("Although a warrantless search usually constitutes a per se Fourth Amendment violation, the automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle

by officers possessing probable cause to do so"); *United States v. Schackleford*, 830 F.3d 751, 753 (8th Cir. 2016) ("Probable cause to believe that an automobile contains contraband or evidence of criminal activity as long been held to justify a warrantless search of the automobile and seizure of the contraband."). The burden is on the Government to justify warrantless searches. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d at 287-88.

Additionally, "[a]mong the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 392 (1914)). "This exception derives from interests of officer safety and evidence preservation that are typically implicated in arrest situations." *Id*. "Under the search incident to arrest exception, officers may search a car incident to arrest and without a warrant if 'it is reasonable to believe the vehicle contains evidence of the offense of arrest.'" *United States v. Slim*, 34 F.4th 642, 647 (8th Cir. 2022) (quoting *United States v. Stegall*, 850 F.3d 981, 984 (8th Cir. 2017), in turn quoting

*Gant*, 556 U.S. at 351). "[O]fficers may conduct a warrantless search of a vehicle incident to arrest—even after the arrestee is restrained in the back of a patrol vehicle—when officers have a reasonable basis to believe the vehicle contains evidence related to the crime of arrest." *Stegall*, 850 F.3d at 984; *see also United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013) ("Even after an arrestee has been secured in the back of a police car, officers may search the vehicle incident to an arrest if their observations provide a reasonable basis to conclude that evidence of the crime of arrest might be found in the vehicle.") (Internal quotation marks omitted).

## C.     *Analysis*

Law enforcement conducted a traffic stop on Defendant for suspicion of drunk driving. Defendant was taken into custody for operating a vehicle while intoxicated. After being taken into custody, law enforcement found a firearm during a warrantless search of the vehicle.

In *United States v. Neumann*, 183 F.3d 753 (8th Cir. 1999), a highway patrol officer stopped the defendant for speeding. *Id.* at 754. The officer noted that the defendant appeared nervous and anxious while retrieving his driver's license and vehicle registration. *Id.* at 754-55. The officer asked the defendant to accompany him to his patrol car while he prepared a warning ticket for speeding. *Id.* at 755. Inside the patrol vehicle, the officer:

> smelled a faint odor of alcohol on [the defendant's] breath. [The officer] asked [the defendant] how much he had had to drink. [The defendant] responded that he had not been drinking at all. [The officer] then asked [the defendant] to take a portable breath test (PBT) to determine whether he had been drinking. [The defendant] initially indicated that he did not want to take the test, whereupon [the officer] told him that South Dakota law required him to take the test. [The defendant] then recanted his earlier statement and admitted that he had drunk one beer about one hour before being stopped. [The officer] administered the PBT, which registered a

12

blood alcohol content of .013, indicating that [the defendant] had consumed
alcohol but was not intoxicated.

*Id*. The officer searched the defendant's vehicle for an open container of alcohol. The officer found one empty beer can and one unopened beer can. During the search for open containers, the officer also smelled burnt marijuana and observed marijuana ashes in the vehicle's ashtray. The officer searched the entire vehicle for drugs and found nearly 100 pounds of marijuana in the back of the vehicle. *Id*.

The defendant moved to suppress the drugs, arguing that "probable cause did not exist to justify the warrantless search of his pickup for an open container." *Id*. The Eighth Circuit addressed the issue as follows:

> The issue before us is whether [the officer] could continue the encounter by searching [the defendant's] vehicle for an open container after he finished issuing the speeding ticket, for "[a] traffic violation alone will not justify an automobile search; there must be probable cause or consent." *United States v. Martinez*, 168 F.3d 1043, 1046 (8th Cir.1999).
>
> "Police may search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence." *United States v. Payne*, 119 F.3d 637, 642 (8th Cir.1997). Probable cause requires "'only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *See Payne*, 119 F.3d at 642 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).
>
> We conclude that [the officer] had probable cause to search [the defendant's] vehicle for an open container. [The officer] had had seventeen years' experience with the highway patrol and significant training in the area of alcohol and drug detection. He testified that lighting a cigarette is usually done to mask an incriminating odor. [The defendant] appeared nervous and anxious and then positioned himself directly against the door while he was in the patrol car. [The officer] suspected that [the defendant] had been drinking, and the PBT confirmed his suspicion. [The defendant] first denied drinking and then admitted to drinking one beer "in a town about 60 miles back." Based on this information, there was probable cause

13

for [the officer] to believe that [the defendant] had consumed beer while driving in his pickup and that there might well be an open container inside the vehicle.

*Id*. at 756 (third alteration in original); *see also United States v. Mena-Valdez*, No. 21-1120, 2021 WL 5985319, at *1 (8th Cir. Dec. 17, 2021) (per curiam) (unpublished) (finding that after smelling alcohol emanating from the vehicle and seeing a red solo cup in the console, officers had probable cause to search the vehicle for open containers).

In *United States v. Sauceda*, No. 4:16-CR-400803-01-KES, 2017 WL 4676606 (D.S.D. Sept. 27, 2017), *Report and Recommendation adopted in United States v. Sauceda*, No. 4:16-CR-400803-01-KES, 2017 WL 4675749 (D.S.D. Oct. 16, 2017), the district court addressed an automobile search based on probable cause that the vehicle contained contraband or evidence. The district court addressed *Neumann* and two similar cases involving the smell of marijuana:

The unifying analysis that ties *McCoy*, *Neumann*, and *Caves* together is not that the odor was emanating from the driver or from the car itself. Rather, the unifying justification for the search in each case was the presence of facts and circumstances that gave rise to the inference that drugs or alcohol had been consumed in the vehicle itself or were stored there and, hence, that they would probably still be present. *McCoy*, 200 F.3d at 584 (strong smell of air freshener emanating from the car); *Neumann*, 183 F.3d at 756 (odor of alcohol coupled with driver's admission of having drunk a beer 60 miles away from the scene of the stop); *Caves*, 890 F.2d at 91 (fact that driver still smelled of marijuana and had been riding in the car for several hundred miles). *See also United States v. Jennings*, 2007 WL 2142260, No. *1 (8th Cir. July 27, 2007) (unpublished) (per curiam) (holding that odor of burnt marijuana emanating from passengers and from interior of car justified search pursuant to the automobile exception because probable cause existed to believe that marijuana had been used in the car). The facts in these cases gave rise to the inference that the car had been used to consume or store illegal drugs in large part because there was evidence that the car had just been driven a significant distance and, given the odor of marijuana on the driver or in the car itself, it was reasonable to assume that

14

the marijuana had been consumed or stored in the car and, therefore, there might still be unused marijuana in the car.

*Id*. at \*23.

In *United States v. Tinsley*, 365 Fed. App'x 709 (8th Cir. 2010) (per curiam) (unpublished), police officers responded to a driver slumped over the wheel of his vehicle. *Id*. The facts of the case were as follows:

> the officers observed [the defendant's] vehicle stopped in the middle of the street, with its left turn signal activated and the engine running. As officers approached the vehicle, they saw [the defendant] asleep in the driver's seat. In an effort to awaken him, the officers began knocking on the window, shaking the vehicle, and shouting. After about two minutes, [the defendant] apparently awoke and, without acknowledging the officers, began to slowly move his vehicle forward.
>
> The officers returned to their squad car and activated its siren. After driving a short distance, [the defendant] stopped his vehicle. Officers again approached the vehicle and shouted for [the defendant] to roll down the window, put the vehicle in park, and open the door. After another two minutes, [the defendant] slowly rolled down his window. One of the officers immediately reached in through the window, put the vehicle in park, and opened the door. Upon opening the door, officers began to remove [the defendant] and smelled a strong odor of alcohol. Based on their observations, officers believed [the defendant] was intoxicated and arrested him for driving while impaired.

*Id*. at 709-10. While two officers were placing the defendant under arrest, a third officer searched the vehicle and found a firearm, cocaine, and marijuana. *Id*. at 710. The defendant moved to suppress the evidence found during the search. *Id*.

The Eighth Circuit determined that officers had probable cause to arrest the defendant for driving while impaired. *Id*. at 711. The Eighth Circuit also determined that the search of the defendant's vehicle was reasonable and not a violation of the Fourth Amendment. *Id*. The Eighth Circuit explained that:

the officers' observations of [the defendant's] behavior coupled with the strong odor of alcohol gave them a reasonable basis to believe that evidence relevant to [the defendant's] intoxication (i.e. the means of intoxication such as bottles containing alcohol) might be found in the vehicle. Thus, under the second prong of *Gant*, the warrantless search of [the defendant's] vehicle incident to his lawful arrest was reasonable.

*Id.*

In *United States v. Harris*, No. 09-00385-01-CR-W-DGK, 2010 WL 2265454 (W.D. Mo. Apr. 22, 2010), *Report and Recommendation adopted in United States v. Harris*, No. 09-00385-01-CR-W-DGK, 2010 WL 2265446 (W.D. Mo. June 2, 2010), a police officer observed a vehicle at night with its headlights off and weaving in traffic. *Id.* at *1. The officer testified that "the manner in which the vehicle was being operated is often indicative of someone who is intoxicated and/or attempting to elude police." *Id.* When immediately behind the vehicle, the officer activated his emergency lights and siren, but the vehicle did not pull over. *Id.* After three blocks the vehicle pulled into a gas station and pulled up to the gas pumps. *Id.* The officer stopped immediately behind the vehicle and exited his patrol car:

> while standing behind the open door of the police vehicle[, the officer] gave very loud verbal commands for the driver of the Mercury to shut the vehicle off and put his hands out the window so the officer could see them. The driver did not respond to the officer's commands. [The officer] could see the driver leaning forward and then reaching back behind his seat. [The officer] continued to instruct the driver to shut the vehicle off and show his hands. [The officer] was concerned that the driver was attempting to get a gun or hiding contraband such as alcohol, narcotics or firearms.

*Id.* at *2 (citations to the record omitted). Eventually, the driver exited the vehicle but continued to disobey the officer's commands. *Id.* According to the officer, the driver "had a dazed look, as if he was under the influence of alcohol and/or drugs." *Id.* The driver was placed under arrest and taken into custody. *Id.*

16

Another officer arrived on the scene. He was advised that:

> prior to the suspect exiting the vehicle, he had done a lot of movement inside the vehicle and had been hesitant to get out. [The arresting officer] testified that based on defendant['s/the driver's] actions before he exited the vehicle (that is leaning forward and then reaching back behind), the officer suspected that there could be alcohol, narcotics and/or firearms within [the defendant's] immediate reach. Further, [the arresting officer] testified that the manner in which [the defendant] operated the vehicle (that is weaving through several lanes of traffic) was consistent with the driver being intoxicated. [The officer who arrived on the scene] searched the vehicle looking for any contraband, such as drugs or weapons, that the driver could have stored within a reach or a lunge. [The officer who arrived on the scene] testified that he was not conducting an inventory search. [He] testified that he had reasonable suspicion that the driver was trying to stuff contraband. [He] recovered a loaded .357 revolver wrapped in a t-shirt from the floorboard immediately behind the driver. The gun was not underneath the driver's seat. Either the driver or the passenger could have reached the firearm. Four more rounds were located in a compartment between the driver and passenger seat. [The officer who arrived on the scene's] search took place after defendant [the defendant] was under arrest.

*Id*. at *3 (citations to the record omitted).

In determining whether the search of the vehicle was lawful under the Fourth Amendment, the district court reasoned that:

> In addition, the *Gant* court justified a search incident to arrest if it is reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle. *See Arizona v. Gant*, --- U.S. ----, ----, 129 S.Ct. 1710, 1719, 173 L.Ed.2d 485 (2009). Defendant . . . was arrested for careless driving and for operating a vehicle under the influence of alcohol or drugs. [The arresting officer] testified that the manner in which [the defendant] operated the vehicle (that is weaving through several lanes of traffic) was consistent with the driver being intoxicated. Further, [the officer] observed [the defendant] leaning forward and then reaching back behind his seat as if hiding contraband. Finally, [The officer] testified that [the defendant] had a dazed look, as if he was under the influence of alcohol and/or drugs. [The Officer's] observations of [the defendant's] behavior gave him a reasonable basis to believe that evidence relevant to [the

17

defendant's] intoxication (such as bottles containing alcohol or drug paraphernalia) might be found in the vehicle. *See United States v. Tinsley*, 2010 WL 681328, *2 (8th Cir. Mar.1, 2010) (warrantless search of vehicle incident to arrest proper under *Gant* where officers' observations of defendant's behavior coupled with strong odor of alcohol gave reasonable basis to believe that evidence relevant to [the defendant's] intoxication (such as bottles containing alcohol) might be found in vehicle).

*Id*. at *6 (citations to the record omitted).

In *United States v. Martinez-Cortes*, 566 F.3d 767 (8th Cir. 2009), officers went to a residence to execute a search warrant related to drug crimes. *Id*. at 768-69. When officers arrived at the residence, a vehicle was backing out of the driveway. *Id*. at 769. Officers approached the vehicle and ordered the occupants out of the vehicle. *Id*. Officers observed "both occupants moving their arms and the driver, later identified as [the defendant], looking towards the middle console and moving as if to shove something between the center console and his right leg." *Id*. The defendant was arrested on an outstanding warrant. *Id*. Officers searched the vehicle and found methamphetamine. *Id*. Among other things, the defendant argued that the search of his vehicle was unlawful. *Id*. The Eighth Circuit determined that:

[The] inherent risks to officer safety were magnified when the occupants of the Excursion did not promptly comply with orders to put the vehicle in park and show their hands, and [the defendant] moved his arms as if to hide something between his leg and the car's console. These furtive actions gave the officers reason to suspect, indeed, probable cause to believe that criminal activity was afoot, and that the occupants might be a risk to officer safety unless detained while the warrant search was completed. This justified the officers' decisions to order [the defendant] out of the Excursion, *see United States v. Stachowiak*, 521 F.3d 852 (8th Cir.2008); *United States v. Spotts*, 275 F.3d 714, 719 n. 2 (8th Cir.2002); to handcuff him, *see United States v. Walker*, 555 F.3d 716, 721 (8th Cir.2009); to run a check for outstanding wants and warrants, *see United States v. Tuley*, 161 F.3d 513, 515 (8th Cir.1998); and to search those areas of the vehicle where

18

a weapon or contraband might be hidden, *see United States v. Bell*, 480 F.3d 860, 864 (8th Cir.2007).

*Id*. at 771.

Pursuant to Iowa Code Section 321J.2, it is unlawful to operate a vehicle while under the influence of alcohol. Additionally, Iowa Code Section 321.284(1) provides that "[a] driver of a motor vehicle upon a public street or highway shall not possess in the passenger area of the motor vehicle an open or unsealed bottle, can, jar, or other receptacle containing an alcoholic beverage." *Id*. Section 321.284(1) also defines "passenger area" as "the area designed to seat the driver and passengers while the motor vehicle is in operation and any area that is readily accessible to the driver or a passenger while in their seating positions[.]" *Id*.

I find that based on the totality of the circumstances, Lt. Bose had probable cause to search Defendant's vehicle for evidence relating to Defendant's intoxication, including open containers of alcohol. Indeed, Defendant was brought to the attention of law enforcement by a report from a Walmart employee that Defendant was intoxicated and causing problems at a Walmart store. Lt. Bose observed Defendant drive erratically, hit a concrete median curb, swerve in his lane, and straddle the white center line multiple times. Defendant did not stop when Lt. Bose and Sgt. Savage activated their emergency lights to pull him over. After being forced to stop with a pinch block maneuver, Defendant backed his vehicle into Sgt. Savage's patrol car. Lt. Bose also observed Defendant engage in furtive movements, appearing to reach to the back passenger seat of the vehicle. Lt. Bose smelled alcohol coming from Defendant's person.[10] Lastly, Lt. Bose noted that Defendant's eyes appeared slightly bloodshot, glassy, and watery. Like

---

[10] The fact that Sgt. Savage did not also smell alcohol on Defendant, does not change the analysis. As explained by Lt. Bose, Sgt. Savage was not as well placed to smell alcohol because of the way the encounter transpired.

in *Neumann*, *Mena-Valdez*, and *Sauceda*, the foregoing circumstances provided Lt. Bose with probable cause to search Defendant's vehicle for open containers of alcohol.

At the hearing, the parties thoroughly explored the implications of Sgt. Savage's use of the code "32" to announce he had drawn his weapon. Sgt. Savage testified he could not see the interior of the Durango. He pulled his firearm not because he had seen a firearm but because of the nature of the call, because he was unsure what was happening, because his patrol vehicle had been hit, and the possibility the driver had a weapon. Both witnesses acknowledged it was rare for an officer to use the term "32" to announce the officer had drawn a firearm. This circumstance might have raised an interesting issue if Lt. Bose had, in fact, misinterpreted Sgt. Savage's statement to indicate he had seen a firearm in the Durango *and* relied on that information to search the vehicle. In fact, Lt. Bose acknowledged that the use of "32" could have meant either Sgt. Savage saw Defendant reach for the back seat or that Sgt. Savage had drawn his own weapon. In either case, it does not appear Lt. Bose relied on Sgt. Savage's use of "32" as a basis to search the vehicle. (Doc. 36 at 25-26.)

Under the second prong of *Gant*, a search does not violate the Fourth Amendment if officers have a reasonable belief that the vehicle to be searched may contain evidence of the offense of arrest. Here, I find that Lt. Bose's search of Defendant's vehicle was this sort of lawful search incident to Defendant's arrest. Defendant was placed under arrest for driving while intoxicated. Based on the circumstances outlined above, including the report of Defendant being intoxicated, observations of Defendant's driving being indicative of intoxication, and the smell of alcohol emanating from Defendant's person, Lt. Bose had "a reasonable basis to believe that evidence relevant to [Defendant's] intoxication (i.e. the means of intoxication such as bottles containing alcohol) might be found in the vehicle." *Tinsley*, 365 Fed. App'x at 711; *see also Harris*, 2010 WL 2265454, at *6.

Additionally, Iowa Code Section 724.4C(1)(b) provides that "a person commits a serious misdemeanor if the person is intoxicated . . . and the person . . . [c]arries a dangerous weapon within the person's immediate access or reach while in a vehicle." *Id*. Similar to the observations made by officers in *Martinez-Cortes*, Lt. Bose testified that after employing the pinch block maneuver and forcing Defendant to stop, and before Defendant exited the vehicle, he observed Defendant shift his shoulders to the right and reach back towards the rear passenger's side seat. (Doc. 36 at 17.) Such "furtive actions" gave Lt. Bose "reason to suspect, indeed, probable cause to believe that criminal activity was afoot," thus justifying Lt. Bose's "search [of] those areas of the vehicle where a weapon or contraband might be hidden." *Martinez-Cortes*, 566 F.3d at 771. Accordingly, I find that Defendant's furtive movements also provided Lt. Bose with reasonable suspicion that criminal activity (driving while intoxicated, open container, and/or possession of a firearm while intoxicated) was afoot. This reasonable suspicion created justification to search the rear passenger seat of Defendant's vehicle.

Finally, Defendant's argument that Sgt. Savage lacked probable cause to enter Defendant's vehicle to search for Defendant's registration is without merit. "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)); *see also United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017) (same). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). Regardless of Sgt. Savage's subjective intentions, the collective knowledge of the investigating officers, including the report of Defendant's intoxication, Lt. Bose's observations of Defendant hitting a median curb, swerving in his lane, straddling the

21

white center line multiple times, failing to stop after officers initiated their emergency lights, backing into Sgt. Savage's patrol car, Lt. Bose's observation of furtive movements by Defendant, and Lt. Bose smelling alcohol emanating from Defendant and observing Defendant with bloodshot, glassy and watery eyes, provided Sgt. Savage with probable cause to search Defendant's vehicle for evidence relating to Defendant's intoxication, for evidence relevant to Defendant's arrest (driving while intoxicated), and based on criminal activity being afoot.[11]

---

[11] The Government argues, in the alternative, that under *New York v. Class*, 475 U.S. 106 (1986), Sgt. Savage's "search was focused and minimally invasive, and, . . . it did not violate the Fourth Amendment." (Doc. 38 at 8.) In *Class*, the Supreme Court held that a police officer does not violate the Fourth Amendment and "may reach into the passenger compartment of a vehicle to move papers obscuring the VIN after its driver has been stopped for a traffic violation and has exited the car." 475 U.S. at 107. The Supreme Court reasoned that "because of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view, we hold that there was no reasonable expectation of privacy in the VIN." *Id*. at 114. Further, the Supreme Court explained that:

> The VIN, which was the clear initial objective of the officer, is by law present in one of two locations—either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile. Neither of those locations is subject to a reasonable expectation of privacy. The officer here checked both those locations, and only those two locations. The officer did not root about the interior of respondent's automobile before proceeding to examine the VIN. He did not reach into any compartments or open any containers. He did not even intrude into the interior at all until after he had checked the doorjamb for the VIN. When he did intrude, the officer simply reached directly for the unprotected space where the VIN was located to move the offending papers. We hold that this search was sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations. Any other conclusion would expose police officers to potentially grave risks without significantly reducing the intrusiveness of the ultimate conduct—viewing the VIN—which, as we have said, the officers were entitled to do as part of an undoubtedly justified traffic stop.

Accordingly, based on all of the foregoing, I recommend that Defendant's motion to suppress be denied.

## IV.  CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress.  **(Doc. 16.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Crim. P. 59.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir.  2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 15th day of November, 2024.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

---

*Id*. at 118-19.  According to the Government, Sgt. Savage's search for Defendant's registration was similar to the officers' actions in *Class*.  The Government states that Sgt. Savage "minimally searched defendant's car by first looking in a customary spot where drivers store registration paperwork, the front center console and cupholder area."  (Doc. 38 at 8.)  I am unconvinced that Sgt. Savage's search of Defendant's center console is similar to the movement of papers obscuring the VIN located on the dashboard of a vehicle.  Thus, the Government's reliance on *Class* is misplaced and I do not recommend the Court rely on the Government's argument in the alternative based on *Class*.